**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

ROBERT MCCARTY,

      Plaintiff,

v.                                Civil Action No. 2:23-cv-454

EXPERIAN INFORMATION SOLUTIONS
INC.; EQUIFAX INFORMATION SERVICES,
LLC; TRANSUNION, LLC and TRUIST BANK
f/k/a SUNTRUST BANK, INC.,

      Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, ROBERT MCCARTY ("Mr. McCarty" or "Plaintiff"), by Counsel, and for his Complaint against Defendants EXPERIAN INFORMATION SOLUTIONS INC. ("Experian" or "Defendant Experian"); EQUIFAX INFORMATION SERVICES, LLC ("Equifax" or "Defendant Equifax"); TRANSUNION, LLC ("TransUnion" or "Defendant TransUnion"); and TRUIST BANK f/k/a SUNTRUST BANK, INC. ("Truist" or "Defendant Truist"), Plaintiff alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x.

2.      Today in America, there are three major consumer reporting agencies, Equifax, Experian, and TransUnion (hereinafter collectively "CRAs").

3.      The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a

1

consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.      The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply "parrot" information they receive from entities like Truist, particularly where a consumer makes a dispute about information reported.

5.      Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information, here Truist. The FCRA demands that each party (both furnisher and CRA) separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.      Plaintiff brings claims under Section 1681e(b) against Experian, Equifax, and TransUnion because each reported inaccurate past due and charge off account information about the Plaintiff regarding a Truist account that had been paid in full. When Plaintiff disputed the inaccuracies, Experian, Equifax, and TransUnion did not reasonably investigate, also violating Section 1681i.

7.      The Consumer Financial Protection Bureau ("CFPB") has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy." Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Experian, Equifax, and TransUnion have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Experian, Equifax, and TransUnion have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both district and appellate courts to do more than an automated parroting of what

their customer-creditors instruct. Had they followed that advice and heeded those warnings, Plaintiff would not have been harmed.

8.      Likewise, Truist violated the FCRA, Section 1681s-2(b), when it received Plaintiffs' disputes from Experian, Equifax, and TransUnion and failed to reasonably investigate those disputes. Instead, discovery will show all Truist did was consult its own records about the account and confirm to the agencies the inaccurate information it was already reporting. This inaccurate reporting also continued despite an agent of Truist recognizing the discrepancies of the inaccurate reporting in a letter to the Plaintiff.

## JURISDICTION & VENUE

9.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p, and the Court has Federal Question jurisdiction pursuant to 15 U.S.C. § 1331.

10.     Venue is proper under 28 U.S.C. § 1391(b) and Local Civil Rule 3(C) because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in this District and Division, Plaintiff is a resident of this District and Division, and each of the Defendants transact business within this District and Division.

## PARTIES

11.     Plaintiff Robert McCarty is a natural person and "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Defendant Experian Information Solutions, Inc. does business throughout the Commonwealth of Virginia.

13.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

14.     Defendant TransUnion LLC ("TransUnion") does business throughout the Commonwealth of Virginia.

15.     TransUnion is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

16.     Defendant Equifax Information Services, LLC, does business throughout the Commonwealth of Virginia.

17.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

18.     Defendant Truist, f/k/a SunTrust, is a National Bank and does business throughout the Commonwealth of Virginia.

19.     Truist is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

20.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan) . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and

1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL

1085874, at *4 (E.D. Va. Mar. 18, 2011).

21.    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

 *Burke*, 2011 WL 1085874, at *4.

22.    "The . . . FCRA . . . was crafted to protect consumers from the transmission of

inaccurate information about them, and to establish credit reporting practices that utilize accurate,

relevant, and current information in a confidential and responsible manner." *Guimond v.

TransUnion Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These

consumer-oriented objectives support a liberal construction of the FCRA,' and any interpretation

of this remedial statute must reflect those objectives." *Cortez v. TransUnion, LLC*, 617 F.3d 688,

706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

23.    Over a decade ago, the Third Circuit apprised TransUnion specifically and

Experian and Equifax generally of the high duty of care imposed by Section 1681e(b):

[T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….

There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as TransUnion did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….

Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading

information finds its way into a credit report through the agency of a third party….

TransUnion remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that TransUnion did not exercise sufficient care here.

*Cortez v. TransUnion, LLC*, 617 F.3d 688, 709–10 (3d Cir. 2010).

24.     Section 1681i(a) requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through a dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

 15  U.S.C. § 1681i(a)(1)(A).

25.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991).

26.     It has long been the law that a CRA, such as Experian, Equifax, or TransUnion, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No.

1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

27.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. TransUnion Corp.*, 115 F.3d 220, 225 (3d Cir.   1997).   Accordingly,   "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that TransUnion's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

28.     Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

29.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

### *Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty of Furnishers Such as Truist to Perform a Detailed and Systematic Investigation of Consumer Dispute*

30.    Today, furnishers such as Truist and other of the CRA Defendants' furnishers, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

31.    Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. The furnisher further must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

32.    "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

357 F.3d 426, 430 (4th Cir. 2004).

33.     Additionally, Truist has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether or not the consumer disputes such reporting.   *Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

### *Plaintiff Discovers the CRA Defendants Were Inaccurately Reporting the Truist Account and Disputes Those Inaccuracies with Truist*

34.     On March 13, 2017, Plaintiff opened a line of installment credit for a vehicle through Truist, then known as SunTrust Bank.

35.     That same year, the vehicle was totaled. Thereafter, payments were to be made by the insurance company, the warranty company, and gap insurance.

36.     On December 20, 2017, the first payment covered by the insurance and warranty companies of $37,282.48 was made. The remaining insurance/warranty payments followed and the Truist loan was paid off in full.

37.     Plaintiff was never in default in payment of the Truist loan.

38.     Plaintiff was never late in paying his Truist loan.

39.     Truist began reporting the Plaintiff as in default and having missed his payments beginning in December 2017 (30 days late), into January 2018 (60 days late) and even thereafter as fully charged off.

40.     By September 4, 2018, Truist was reporting the account as charged off in the amount of $11, 057—many months after the loan had been paid in full by the insurance and warranty companies.

41.     On March 30, 2022, Mr. McCarty sent a letter to Truist challenging the reported charge-off because the loan had been satisfied in full. He detailed the reported late payments contradicted the payments received those same months from the insurance or warranty companies. This letter also informed Truist that Mr. McCarty had not been contacted or alerted that the payments were not applied properly to his loan. Since the payments had been received and the balance was satisfied, Plaintiff requested his credit report be corrected.

42.     On April 21, 2022, Jennifer Markham, a Truist Vice President at Plaintiff's local bank branch, responded to Mr. McCarty's letter. In this response. Ms. Markham acknowledged that Truist had errored and that there were discrepancies between the reporting and payment processing by Truist. This processing error reflected that Mr. McCarty was delinquent on the loan because the payment had only covered the principal and not the interest.

### *Plaintiff Disputes the Inaccuracies with the CRAs*

43.     Over the last two years, the Plaintiff has made numerous disputes to each Defendant.  The allegations herein are detailed as examples only and without limitation.

### Experian

44.     In or around March 2022, Mr. McCarty files a dispute with Experian regarding the delinquency and charge off reporting on this closed Truist account.

45.     On or about April 4, 2022, Mr. McCarty was informed of the results of his dispute with Experian. These results included no noticeable difference between the credit reports before

10

and after the dispute, and the Truist account as still being reported as a paid, charge off of $11,057.

46.     On or about May 12, 2022, Mr. McCarty sent a second dispute letter to Experian identifying the account being incorrectly reported as a charge off.

47.     On or about May 24, 2022, Experian responds to the dispute with an update; however, this update still included the status of the account as paid, closed, with $11,057 written off.

48.     Despite multiple disputes informing Experian of the inaccurate reporting of the Truist account, the reporting had not been corrected, and the disputed account as still reported as a charge off negatively affecting Mr. McCarty's credit score and future credit opportunities.

**Equifax**

49.     On or around April 2022, Mr. McCarty files a dispute with Equifax regarding the delinquency and charge off reporting on this closed Truist account.

50.     On or about April 12, 2022, Mr. McCarty was informed of the results of his dispute with Equifax. The results of this dispute stated that the prior paying history on the account was updated, but that the creditor (Truist) verified to Equifax that the current status (paid charge off) was being reported correctly.

51.     On or about May 12, 2022, Mr. McCarty sent a second dispute letter to Equifax identifying the account being incorrectly reported as a charge off.

52.     On or about May 21, 2022, Equifax responded with a form letter stating that it was currently processing Mr. McCarty's previously submitted dispute for that account and that because of that, Equifax will not be conducting further investigation at this time. At this point, the status of the account was still a charge off.

53.     Despite multiple disputes informing Equifax of the inaccurate reporting of the Truist account, the reporting had not been corrected, and the disputed account as still reported as a charge off negatively affecting Mr. McCarty's credit score and future credit opportunities.

**TransUnion**

54.     On or about May 3, 2022, TransUnion sent Mr. McCarty a credit monitoring alert that a delinquency had appeared on Mr. McCarty's credit report. This delinquency was the Truist account's status labeled as collection/charge off.

55.     On or about May 12, 2022, Mr. McCarty sent a dispute letter to TransUnion identifying the account being incorrectly reported as a charge off.

56.     On or about May 25, 2022, TransUnion sent the results of their investigation to Mr. McCarty. This update had the pay status as account paid in full, was a charge off. It also still included the account as in delinquency.

57.     Despite the dispute informing TransUnion of the inaccurate reporting of the Truist account, the reporting had not been corrected, and the disputed account as still reported as a charge off negatively affecting Mr. McCarty's credit score and future credit opportunities.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

58.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of the CRA Defendants to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Both Equifax and TransUnion use the same vendor, previously known as Intelenet Global Services and now as Teleperformance. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mailed disputes.

59.     These dispute processing vendors are not hired to perform an actual FCRA investigation.  Instead, the vendors' sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

60.     In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, TransUnion, or Experian. It gets sent to the CRA Defendants' creditor customers (such as Truist) for their sole review and consideration.

61.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes, scans them into a batch of other disputes.

62.     TransUnion, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

63.     Both Equifax and TransUnion then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company by skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.

64.     Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

13

65.     Equifax and TransUnion have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

66.     TransUnion has taken and succeeded with this same position. *See, e,g.*, *Wilcox v. Servis One, Inc*., No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that TransUnion did not have control or the ability to produce for deposition Indian employees of Intelenet).[2]

67.     Regardless of whether these statements are correct, Equifax, TransUnion, and Experian believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in this District with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA— as his alleges against Equifax and TransUnion for their farming-out of investigations to Teleperformance.

68.     Equifax, TransUnion, and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *The CRA Defendants Forwarded Plaintiff's Disputes*
### *to Truist, Who Did Nothing*

69.     In each instance in which Plaintiff disputed the Truist account with the CRAs, the CRAs forwarded Plaintiff's disputes to Truist using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

70.     On information and belief, e-Oscar is also the system by which Truist have agreed they will accept such consumer disputes from the CRAs.

71.     Under such circumstances, Truist became obligated under the FCRA to investigate Plaintiff's disputes.

72.     Plaintiff's dispute to Truist to attempt to have them reinvestigate his complaints went unanswered, as Truist still continues to report the inaccurately labeled delinquent Truist account to CRAs.

73.     Truist failed to reinvestigate Plaintiff's complaints.

74.     Despite a Vice President of Truist, Jennifer Markham, acknowledging in a letter to Mr. McCarty that the discrepancies in the account reporting and processing were a processing issue, not due to any fault of Mr. McCarty, and that the balance was completely satisfied as per Truist's system, Truist was still incorrectly reporting the account as delinquent and a charge off to the CRAs. Discovery will show that all Truist did when supposedly investigating Plaintiff's disputes from the CRAs was consult their own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

75.     On or about a date better known to Equifax and Truist, Equifax furnished Plaintiff's disputes to Truist.

76.     On or about a date better known to TransUnion and Truist, TransUnion furnished Plaintiff's disputes to Truist.

77.     On or about a date better known to Experian and Truist, Experian furnished Plaintiff's disputes to Truist.

78.     Truist failed to reasonably reinvestigate Plaintiff's disputes that Truist received from Equifax, Experian, and TransUnion in violation of § 1681s-2(b)(1)(A) of the FCRA.

79.     Defendant Truist further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to correct or update the account's pay status after receiving Plaintiff's disputes from Equifax, Experian, and TransUnion and prior to the commencement of this action.

80.     Equifax, Experian, and TransUnion responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that Equifax and TransUnion communicated Plaintiff's disputes to Truist.

81.     Upon information and belief, Experian timely notified Truist of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

82.     Alternatively, Experian failed to notify Truist of Plaintiff's disputes, and/or failed to provide the supporting documents submitted with Plaintiff's disputes.

83.     Upon information and belief, Truist received timely notice of Plaintiff's disputes from Experian and the supporting documents submitted with Plaintiff's disputes.

84.     By its actions as described herein, Truist furnished and communicated false credit information.

85.     On or about a date better known to Equifax and Truist, Equifax furnished Plaintiff's disputes to Truist.

### *Plaintiff Suffered Actual Harm*

86.     Defendants have continued to report the derogatory, disputed Truist account on the Plaintiff's credit reports, despite being notified that this information was incorrect.

87.     Plaintiff has been attempting to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

88.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a.   Damage to his credit;

   b.   Monies lost by increased down payments and monthly payments for his residence(s);

   c.   Monies lost by forced sale of properties instead of using the properties as rentals;

   d.   Monies lost in business revenue due to crippled business financing;

   e.   Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

   f.   Loss of time attempting to cure the error, e.g., send disputes;

   g.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life; and

   h.   Stress associated with attempting to resolve this matter in the last year.

### *Defendants' Conduct Was Willful*

89.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well."

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

90.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418;  *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

91.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

92.     Discovery will show that the CRA Defendants have received at least tens of thousands of consumer disputes regarding Trust's allegedly inaccurate credit reporting – more than sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting and certainly enough to require further audits and investigation of Truist's investigation and FCRA compliance procedures.

93.     The CFPB has maintained a Consumer Complaint database since 2011.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

94.     Each Defendant regularly receives unredacted consumer dispute details from this database.

95.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

96.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

97.     Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to TransUnion.

98.     Further, tens of thousands each of the CFPB complaints against Equifax, Experian, and TransUnion were expressly stated as based on their failure to reasonably investigate consumer disputes.

99.     Just in the last 12 months alone, Experian, Equifax, and TransUnion have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

100.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

101.    Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of

information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74

(D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of

plaintiffs' account. Many courts, including this one, have concluded that where a CRA is

affirmatively on notice that information received from a creditor may be suspect, it is

unreasonable as a matter of law for the agency to simply verify the creditor's information

through the ACDV process without additional investigation.").

102.    Equifax has even been warned by one of its home state District Courts, the

Southern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the
> dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b)
> (1998). According to Equifax, the reporting agency's duty under § 1681i is
> fulfilled once it forwards the complaint to the creditor, the entity in the best
> position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of
> information, such as creditors, have certain duties to investigate consumers'
> disputes. Yet, this does not end the inquiry, or establish that the reporting agency
> has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable
> investigation by deferring entirely to another source of information. "In a
> reinvestigation of the accuracy of credit reports, a credit bureau must bear some
> responsibility for evaluating the accuracy of information obtained from
> subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of
> investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC
> Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit
> Bureau,* 608 F.Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D.

Ga. Aug. 29, 2005).

103.    TransUnion has long been on even clearer notice. The seminal Circuit Court

decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable

reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer

was a TransUnion case. *Cushman v. TransUnion Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

TransUnion's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to TransUnion, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

104.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

105.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3] The AG Settlement required amongst many changes and mandates that the CRA Defendants comply with § 1681i(a).

106.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

107.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX

*Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting*

*Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

108.    The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

109.    Among many of the CRA Defendants' accuracy failures, the NCLC Report

discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

---

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

110.    Proportionately similar, Truist has also been sued in federal court hundreds of times for consumer credit claims by consumers – most involving alleged violations of the FCRA.

111.    Further, Truist (and SunTrust before it) has received close to 2,000 consumer complaints from the CFPB regarding its credit reporting errors.

112.    Truist had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

113.    Truist had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

114.    Truist had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

115.    Truist had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

116.    Truist had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

117.    Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

118.    Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of § 1681e(b) of the FCRA – against Experian, Equifax, and TransUnion

119.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

120.    Defendants Experian, Equifax and TransUnion willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

121.    As a result of this conduct, action and inaction of Experian, Equifax and TransUnion, Plaintiff suffered damage as alleged above, including by example only and without limitation by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

122.    Further, after Plaintiff's disputes put the CRAs on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Equifax and TransUnion each ignored such information and did not use any human or

substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

123.    Experian, Equifax and TransUnion each furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

124.    Experian, Equifax and TransUnion's conduct, action and inaction were willful, rendering each liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

125.    As a result of Experian, Equifax, and TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative their statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

126.    Plaintiff is entitled to recover his costs and attorney's fees from Experian, Equifax, and TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**Violation of § 1681i of the FCRA – against Experian, Equifax, and TransUnion**

127.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

128.    Experian, Equifax, and TransUnion willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Truist; by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

129.    Further, Equifax, TransUnion, and Experian violated Section 1681i by conducting ***no investigation at all***. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party-the consumer reporting agency who received the disputes-must investigate those disputes. The statute does not contemplate someone other than Equifax or TransUnion conducting the investigation.

130.    Yet, both Equifax and TransUnion used an unrelated third-party, Teleperformance, over which neither CRA has control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and TransUnion therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

131.    As a result of this conduct, action and inaction of Experian, Equifax and TransUnion, Plaintiff suffered damage as alleged above, including by example only and without limitation by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

132.    As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

133.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

134.    The Plaintiff is entitled to recover his costs and attorneys' fees from Experian, Equifax, and TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### Violation of § 1681s-2(b)(1)(A) of the FCRA – against Truist

135.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

136.    Defendant Truist violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's disputes after said disputes were furnished directly to them by Experian, Equifax, and TransUnion.

137.    As a result of this conduct, action and inaction of Truist, the Plaintiff suffered damage as alleged above, including by example only and without limitation by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

138.    Truist's conduct, action and inaction was willful, and Truist is liable for actual or statutory damages and punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n.

139.    The Plaintiff is entitled to recover his costs and attorneys' fees from Truist in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
### Violation of § 1681s-2(b)(1)(C) – (E) of the FCRA – against Truist

140.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

141.    On one or more occasions within the past two years, by example only and without

limitation, Truist violated 15 U.S.C. § 1681s-2(b)(1)(C), (D) and (E) by publishing the

inaccuracies within Plaintiff's credit files with Equifax, Experian, and TransUnion without also

including a notation that these debts were disputed and by failing to correctly report results of an

accurate investigation to each credit reporting agency (such as the fact that the payoff checks had

been received).

142.    Truist knew that the Plaintiff previously disputed the subject account on multiple

occasions directly with Truist and its agents.

143.    The Plaintiff's disputes were, at a minimum, *bone fide*.

144.    On information and belief, the Plaintiff alleges that the procedures followed

regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that Truist

intended their employees or agents to follow.

145.    On information and belief, the Plaintiff alleges that Truist's employees or agents

did not make a mistake (in the way in which he or she followed Truist's respective procedures)

when he or she received, processed and responded to the Equifax, Experian, and TransUnion's

ACDVs and did not include the disputed status or the payoff details.

146.    On information and belief, the Plaintiff alleges that Truist have not materially

changed their FCRA investigation procedures regarding the CCC field in ACDVs after learning

of their failures in this case.

147.    As a result of Truist's violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), the

Plaintiff suffered actual damages, as alleged above, including by example only and without limitation by

loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores,

reduction in lines of credit, and denial for various financial products, the mental and emotional

pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why they lost the ability to benefit from credit.

148.    The violations by Truist were willful, rendering Truist liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Truist was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

149.    The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Truist in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory, and punitive damages against Defendants; for his attorney's fees and costs; for prejudgment and post-judgment interest at the judgment rate; and such other relief the Court deems just and proper.

September 14, 2023                    Respectfully submitted,

**ROBERT MCCARTY**

By:    */s/Leonard A. Bennett*
       Leonard A. Bennett, Esq., VSB #37523
       Craig C. Marchiando, Esq., VSB #89736
       **CONSUMER LITIGATION ASSOCIATES, P.C.**
       763 J. Clyde Morris Blvd., Ste. 1-A
       Newport News, VA 23601
       Telephone: (757) 930-3660
       Facsimile: (757) 930-3662
       Email: lenbennett@clalegal.com
       Email: craig@clalegal.com

Drew D. Sarrett, VSB # 81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 East Broad Street, Suite 300
Richmond, VA  23219
Telephone: (804) 905-9900
Fax: (804) 905-9902
Email:  drew@clalegal.com

Kristi C. Kelly, VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com

Laura D. Niday
Third Year Law Student
George Mason University
Antonin Scalia Law School
Third Year Practice Motion Forthcoming